Dr. Goldenberg, you will hear the next case, United States v. Eldridge and Allen. Good morning. Good morning. Good morning, Your Honors. May it please the Court. Attorney Devin McLaughlin for Defendant Appellant Mr. Eldridge. Obviously, we've raised a lot of issues in our brief, so I'm going to start with the 924C argument. Any other issues the Court wants to address, obviously, please interject as I'm sure you will. So the 924C, Count 7. From our perspective, it's unconstitutional under Davis. The government admits that the two predicate acts are pled in Count 5 and Count 6. The government concedes that the Vicar kidnapping and the conspiracy to commit Hobbs Act robbery do not qualify as predicate acts, but asserts that the attempted Hobbs Act robbery will satisfy the predicate act requirement for the 924C crime of violence. Point number one is he wasn't indicted under that. If you look at the indictment, and the government's responsible for the language in the indictment, but in Government Appendix 1314, it reads to me like conspiracy. It reads like a conspiracy to attempt Hobbs Act robbery. Right. That's how I read it. It's not the usual way these things are charged. Not the usual way they're charged. And the government's responsible for the indictment. And if you wanted a separate predicate called attempt, you would charge it as attempt. And I read it the same way Your Honor does, which is … But there can't be such a thing. Right. You can't conspire to attempt, right? Correct. And so because, I mean, here the jury was instructed that these crimes were violent. It wasn't a dispute at the time. We can't rely on the jury having found anything different than what's set forth in the indictment. And as Your Honor indicates, one is a nullity, and so you're just left with a conspiracy to commit Hobbs Act robbery. Can I just ask you about that? Because I read the indictment the same way, is I would have read it as a conspiracy to attempt, which, of course, is nonsensical. Right. But it's my impression that both parties in the Court were operating under a very different impression about how it should read, is they basically read out the word too. Right. And sort of read it as not alleging an abomination and alleged as too alternate, one of them being to simply attempted Hobbs Act robbery. And that's how it seems to me that it was charged to the jury and that everybody was operating under that assumption at trial. Right. So nobody argued before the district court that there was this conspiracy to attempt. Right. In fact, the whole trial seems predicated on it being a different thing. So in that point, is it really sort of did everyone act as though that was simply a Scrivener's error and that the Particle II, T.O., was just sort of left in there and no one read it as saying something nonsensical? So I have to agree with you, Your Honor, because it was instructed to the jury in both ways, including specific instructions on attempt to commit Hobbs Act robbery. The question is, what does the fact that the jury was instructed on that mean in connection with this now post hoc Davis analysis when, frankly, they were told that both counts 5 and count 6 were crimes of violence? So as I'm trying to navigate what are we supposed to take as the predicate act, I can't really rely upon what the jury did or how the jury was instructed or where they ended up, because they were instructed both of those crimes were crimes of violence, you know, regardless of how you slice it. So I think in terms of divining what are we going to use for a predicate act, you have to get back to the language. And when you get back to the language of the indictment, you're left with my position, which is the only thing that's actually there. There was no objection below, right? No, no. Nobody said there was a constructive amendment. Nobody said there was a variance. Everyone just seemed to be operating under the under a certain reading of the indictment that seemed sort of common sense and assuming that it didn't say something ridiculous. And everyone just seemed to move forward. If you could just then maybe address what I would consider sort of the Yates point. Let's just assume for the sake of argument and not suggesting you're conceding this, that the two predicates alleged are actually or the second predicate is simply an attempted Hobbs Act conspiracy and not a conspiracy to attempt. Right. What's your Yates argument there? Because my understanding is that was not a preserved objection. So that would be subject to plainer review. But how would you play that out under Yates? Well, so in terms of the word attempt, attempt under 924C is use, attempted use or threatened use of physical force. And the notion that attempted use of physical force, that is going to somehow create a generic category of attempt that is going to be exempt from this Court's categorical approach, it can't be. They're both inchoate crimes. And so you have to go ahead and use the categorical approach. And when you look at Jackson and when you look at Gonzalo's, it's clear that the minimum conduct necessary to go ahead and satisfy these elements can be established without actual attempted use of force. And there's a bevy of district court opinions from this circuit that have used that analysis and I think used it correctly. If you were going to use the middle phrase of use, attempted use or threatened use, I mean, from my perspective, use is you hit somebody over the head with a club. Attempted use, you try to hit them and it's stopped. Threatened, you threaten them with it. I mean, that's what that's intended to be. It's not intended to exempt all attempt crimes from it. And under the categorical approach, you can't exempt any crime from it. You have to look at how could this actually be committed. And the reality under Jackson and Gonzalo's under the circuit is that those can be committed with not actual use of attempted force. And that's what the rule. Breyer. It sounds to me like you're saying even if you construe that second predicate as attempted Hobbs Act robbery, that would ñ neither one would be a valid predicate. Correct. Let me ask you the slightly different question. And, again, I'm simply posing the hypothetical. I'm not suggesting you've conceded it. But assuming attempted Hobbs Act robbery were a valid predicate, what would your argument be under Yates as to whether Account 7 still goes out the window and the notion that you can't tell, you know, you have a valid predicate, you have an invalid predicate, and you can't tell? You know, how does that map out? You know, from our perspective ñ If you had two possible predicates, one ñ and, again, assume one's valid, assume one is invalid. How would this Court engage in the analysis of what to do with the 924C count? From our perspective, Your Honor, obviously, we'd be asking that ñ I mean, it's the government's burden to go ahead and prove its case. We need to figure out what a valid predicate is. I don't know how you can ñ and I guess I'm going to duck the question. I don't know how you can end up discerning which predicate would be the one that this Court would go ahead and use. I mean, if there is attempted Hobbs Act robbery, and Your Honors find that attempted Hobbs Act robbery is a valid predicate, and you find that attempted Hobbs Act robbery was a predicate included here because you read the indictment in a different way, I can't offer a way around that. So, and I apologize for that. I understand that that's kind of ñ throwing two hypotheticals layered on top of each other. All right. And so, Your Honors, I'll reserve my time. Can I just ask one question about the 924Cs? Your other argument is that it's not clear which gun was used for the two 924Cs, right? That it could have been the same gun for each. Correct. I mean ñ That the Johnson robbery was part of the narcotics conspiracy, and it's also part of the robbery conspiracy or attempt. Correct. And so it would be improper to have the same possession supporting two separate convictions for a 924C. Exactly. And there is no instruction that you have to ñ you can't base the ñ both 924Cs on the same use of a gun. And because the government emphasized in the court ended up finding that the Woody Johnson robbery was a substantial piece of the support for the narcotics conspiracy, the use of the gun in connection with the Woody Johnson robbery, from our perspective, has a high probability of being the gun that, you know, that supported both counts. But, again, no objection below on that point. Correct. So we're stuck with plain error on that, and so we're stuck with plain error on that. Can I ask one more? Sure. Again, let me give you another hypothetical. Let's assume we agree with you as to Count 7. It's a hypothetical you would presumably like. Yes. Thank you. What do you propose would be the remedy that you would then seek? Would you ask for a resentencing, that we'd remand for resentencing? I think you'd be stuck with remanding for resentencing. Most of the decisions that I've seen, when you take a 25-year component out of the sentence, which Judge Arcaro used in terms of justifying what his other sentence is going to be, what I've seen consistently is that you have to remand for resentencing with that 25 years out, and now the judge may or may not do something different on the other counts. So thank you. Thank you very much. It still would be a long sentence. It's 25 years. I'm trying to do a math in my head, but yes. Yeah. You still have 30 years sitting there. All right. Thank you. We'll hear from your colleague. May it please the Court, Cheryl Myers Booth on behalf of Appellant Kevin Allen. I'd like to use my time to focus on Point 1 in our brief, in particular the issue of the black curtain that was placed around the defense tables in the courtroom for the entire trial. Central to the right of a fair trial is the idea that a defendant is entitled to be judged guilty or innocent based solely on the evidence introduced against him or her at trial in that experience. So why does the curtain undermine that? The curtain, Judge, is inherently prejudicial. If we assume the jury box in this courtroom is against the windows. We saw the photos, so we know what it looked like. Yeah. But what was the jury likely to infer from a separation by a black curtain? We would say that it was likely to infer that the defendants were somehow in need of having to be separated. But they are separate. I mean, there are two separate tables, just as there are here. So separation is inherent. It's obvious. There is separation. There's never – I've never seen a curtain in the middle of a courtroom and go behind the defense like that. And with all the – The fact that you've never seen it doesn't – I mean, I guess I'm trying to figure out what is prejudicial or what is the inference that a jury would draw from it. Well, it's the same inference that the New York State Court of Appeals said in Cruz a jury would draw, that the defendants are either shackled, number one, and that's why the curtain has to be – Why would jurors know anything about the possibility of seeing a defendant shackled? I mean, I've never seen a defendant shackled in 20 years in court as a prosecutor. So why would we intuit that jurors who may or may not have ever set foot in a court would somehow intuit that a black curtain is somehow hiding shackles? If not shackles, then there has to be some explanation. Maybe it's a security measure that they discern from. Why couldn't it be that they – they have a privacy right in all of their briefs and the evidence that they're going to pull out, and the prosecutors and the jurors shouldn't be snooping at all of the defendants' private things? Well, first of all, the jury couldn't snoop because they don't ever come even close to the defense tables in the courtroom. So the prosecutor shouldn't be snooping at all the top-secret briefs that the defendants have at their feet? Well, that – that would be, I guess, all right if you had a curtain around the prosecutor's side of the, you know, the courtroom, too, so the defense didn't snoop into the prosecutor. So the jurors can infer that the court is more solicitous of defense rights than the prosecutor's rights? I guess I'm just wondering, where do you get the shackle thing? Where do we get this notion that jurors are supposed to intuit that a rare procedure must be occurring right now that was never discussed in front of them? It was never discussed in front of them, but certainly having a curtain that divides off and pens us in as the defense certainly, I think, would lead a jury, a reasonable juror, to view us suspiciously, to wonder why the curtain's there. Combined with the totality of circumstances, you have armed security more so on our side than anywhere else in the courtroom. And I think that if we look at what the Supreme Court has said in its trilogy, Deck, Holbrook, and Estelle, if, for example, in Estelle, the Supreme Court found it inherently prejudicial to have a defendant come in in prison garb, no barriers or anything, but just in prison garb, that a jury would think, hmm, that person may be something, that person may be dangerous. So the photograph that's in your brief, that's the only photograph that's in the record? It's the only one Judge Arcaro would let us take, Judge Chin. Okay. And so looking at the photo, the jury box is on the left side of the photo? Correct. And so we don't know what the jury's view? Exactly. We didn't have any input. The defense didn't have any input in which angle the photograph was taken we would have preferred from the jury box, because the entire time that we're on trial, some of the three weeks that the government's case took to put in, the jurors are staring at basically this black curtain, and then ---- I don't know. That might be an exaggeration. I mean, it's the height of the table. I don't know that they're staring constantly at the black curtain. But, I mean, why is this so bad, just looking at it? I mean, does this really send all sorts of bad signals about these defendants? It does, Judge. What we had asked Judge Arcaro to do is, if you're going to do that on our side, at least put something on the prosecutor's side so that maybe the jury would think it's a decoration or something or had some other, you know, purpose like Judge Nardino was getting at. But here, where it's just the defense, I think jurors are sophisticated enough watching, you know, pop culture, law and order, things like that. You don't see anything like that ever in a courtroom, and they're going to wonder about it. And what may ---- anything that makes the defense stand out or put the jurors' focus on the defense more so than on the prosecution, I think, has the potential to be inherently unfair. Isn't it the case, though, that the district court here said, look, I'm worried I might have to shackle these guys during trial? The marshals, in the exercise of their expertise in managing courtroom security, they want them shackled. I'm going to go out on a limb here and sort of take what I consider to be a risky decision and not shackle them. But I'm worried that at some point they're going to misbehave and I might have to shackle them. And the last thing I want to do is have to shackle them in the middle of the trial and either, A, have the jury see the shackles or, B, see a change in the courtroom from which they might deduce from potentially having seen the defendants misbehave, right? In front of the jury. And then all of a sudden they see the court institute some sort of new barrier. And then they would make the inferential leap. Well, the only thing that's different is that these guys had an outburst. Now there's a curtain. Now maybe they'll make an inference that it's hiding shackles or something. So my understanding is that he put the curtain up in advance of trial based on very And this was designed to protect their rights against the very thing that you're concerned about. I mean, it seems like this putting up the curtain in the way and giving the record here was designed to be solicitous of the defendants' rights rather than to prejudice them. I mean, it would have gone horribly wrong, right, if in the middle of trial there was an outburst, they misbehaved, the court said, all right, we're going to call a recess, and the next thing you know the jury comes out and now there's a curtain. I mean, that would have been way worse for your clients, right? Judge, I see my time's up. Yeah, no, please. May I answer your question? I don't buy into that reasoning because when we first raised this with Judge Arcaro, he had, Sua Sponte decided he was going to shackle based on the marshal's recommendation. There had never been anything in the case that would have been a basis for him to shackle. There had been no outbursts over six years that it was pending. None of the defendants, none of the three of them, had ever had any issues in court with behavior. There was nothing like in any of the other reported cases, like them giving a hard time to the marshals during transport or anything. So there really was no basis for it. And when we called him on it, Judge Arcaro said, well, I've done it in other trials. And then when we said you can't rely on past practice, he said, well, the marshals recommend it because of the nature of the charges. Well, just because they're charged with serious crimes doesn't mean you can do it either. So then he said, well, what if I have to shackle them? Well, you don't because there's no basis to shackle them. And if they do something that you view as necessitating shackles, well, then now they're on warning that that could be a consequence, except that at the time that he was trying to rationalize putting the curtain up or not taking it down, they had done nothing and they shouldn't have been shackled. And so exactly what you said, the jury looking at the curtain would think, oh, it's a precaution against something. They must be dangerous. Maybe they're going to have an outburst. Maybe they have to be separated from the prosecutor. And all of that together is unfairly prejudicial. It shouldn't have been there. He should have taken it down. There was no reason not to take it down. Thank you. Thank you. We'll hear from the government. Good morning. May it please the Court. Assistant U.S. Attorney Catherine Gregory representing the United States with me today is the AUSA who handled the trial, Joseph Trippi. I do want to clarify at the outset the Count 7 Davis issue. The government did not concede at all that kidnapping was not a crime of violence. And in fact, this Court held in United States v. Proddy, which came down in 2018, that state law is by its face a crime of violence under 924C3A. So that's a summary order opinion, but there's no reason that that shouldn't also, that the same reasoning shouldn't apply in this case. Turning to the conspiracy versus attempt, yes, Davis did dispense with the conspiracy aspect of Count 6. However, attempted Hobbs Act robbery is a crime of violence. Well, did you charge attempted Hobbs Act robbery? The wording in the indictment is strange. It was, but as I believe Your Honor noted, everyone seemed to understand that this was not charged as conspiracy to attempt. That doesn't make sense. It was intended to be charged as conspiracy or attempt. And if you look at the verdict sheet, that is how it's written and that's how the district court instructed it. But is that a constructive amendment of the indictment? No, but when you do that at the end of trial? No, but when we're reviewing this for plain error and we're trying to determine whether or not this affected his substantial rights, the answer is no. Because everyone, the instructions treated it as conspiracy versus attempt. The verdict sheet treated it as conspiracy versus attempt. So when we're reviewing it for plain error and looking at did this affect the substantial rights or affect the fairness of the proceedings, the answer is no. Because the verdict sheet treated it as conspiracy versus attempt. Well, let's jump ahead because time is short. But if, let's say we agree with you, just for purposes of this question, that attempt is a crime of violence and that you charged it. And that kidnapping is a crime of violence. We haven't resolved that, but let's just assume that's the case. But we all agree that conspiracy to commit Hobbs Act robbery is not a categorical crime of violence. So any way we can know which of these three acts the jury found beyond a reasonable doubt? Well, under Fitzgerald, as this Court held, when there are alternate theories charged and there is viability as to at least one of the alternate theories, then the conviction should be upheld. So in this case, we don't need to know which one necessarily. And it's the appellant's burden at this stage to show that it was based on, for example, the conspiracy, which I think everyone here agrees is no longer viable for a crime of violence. It's his burden to show that that's what he was convicted on. How do we know whether the jury unanimously agreed that it was attempted Hobbs Act robbery, for example? I'm sorry. I don't understand. Well, I mean, usually there's an instruction to a jury that if there are alternatives, they've got to be unanimous as to which alternative. Was there such an instruction here? There was the — I believe there were the standard instructions about you must be unanimous in your decision, and then — I understand. Unanimous as to the underlying predicate. Yes. I don't recall offhand. I would have to refer to the instruction. Where there is an option in both support, the jury should be told that they need to be unanimous as to which one. And so the question is, was there such an instruction here? I'm sorry. I don't recall offhand. Okay. Could I just ask you to clarify? You cited Fitzgerald. I'm just looking. But Fitzgerald is an evidentiary sufficiency case, aside from also being a summary order. But, I mean, there's a big difference between a doctrine that says when there are two different theories, one of which is legally invalid, we will assume that the jury convicted on the one that's not legally invalid, right? I mean, that's different. That's not Fitzgerald. We're not talking about alternate sufficiencies. We're talking about alternate roles with legal validity, right? If one is invalid under Davis, one is valid under Davis. We're talking about something different, right? That's correct, Your Honor. But at this point, again, it's plain error review. No one objected to this. No one even objected to the Vicar kidnapping, which he conceded that all of these were, or he stipulated that all of these were crimes of violence. So on plain error, we're asking not what do we assume here and work backwards from that. We're asking, did this, did, if there was plain error, and there certainly was as to the conspiracy, did it affect his substantial rights? And the answer would be no, because these alternative viable theories were there. And you're saying, is that under the burden shifting framework, so that because the burden of prejudice under plain error review, the burden of showing prejudice falls on the defendant rather than the government? That's correct. So he would, under your theory, the defendant would be obligated to demonstrate that the jury, in fact, did not rely on a legally valid basis, and therefore, because it's inherently unprovable, you know, in this kind of a claim, the defendant automatically loses. In this case. On the third prong. Yes. I would like to address the speedy trial issue. No one disputes that this was a very lengthy delay, but the Court has held that delay, the Supreme Court has held that delay alone cannot carry a Sixth Amendment claim. And if we look at every other factor here, they all weigh against finding a speedy trial violation. First, as we repeated in our brief many times, and as the appellant conceded in his opening brief, he never asserted his right before the district court, not once, not in six years, between indictment and trial, either through his counsel or on his own. In one of his letters to the Court, did he assert his right to a speedy trial? Well, I noticed that there's no assertion of a violation of the Speedy Trial Act at all. And so, is the record clear that sort of the Speedy Trial Act was scrupulously followed and exclusions were found on the record? Yes. That claim wasn't made, so I haven't done the in-depth analysis of what I believe is over 600 docket entries. But yes, the court was, the magistrate judge was making those findings of this is not, and there has not been a Speedy Trial Act claim. But he also, I mean, he doesn't have to say magic words. He didn't even intimate, like, this is going too slowly, or, you know, I want to speed things up. Nothing along those lines. And again, that was essentially conceded in his opening brief that he never raised this issue, either on his own or through counsel. So that factor immediately weighs against finding a violation here. The reasons for the delay are many. This was a very long case. But I will say by my count, there are about 122 defense pretrial motions on 88 separate docket entries, and those did not all come at the beginning of the case. Now, it appears from the record, and we have to do this as an analysis now because the district court never got a chance to do it, it appears that that was the strategy, which is a perfectly viable defense strategy. There were 19 motions made in the first year, 20 in the second, 20 in the third, and on and on for the length of the case up to trial. Now, almost every time those motions were filed late, past the scheduling deadline, or they were requesting an extension, asking for more time. So, you know, even the first extension that the government requested, which Eldred brings up in his reply brief, he says the government moved for an extension as early as March 6, 2010. Well, that's not really the case. It's document number 33. If you just look at the docket, it appears that the government is moving for an extension, but if you actually open the motion, the government was joining in a defense oral motion that had been made a month prior. So they were already asking for an extension on the very first motion schedule, and the government a month later submitted something in writing. So it's – I hate to nitpick individual documents on what is a very lengthy docket, but unfortunately that's what we need to do because the district court never had a chance to analyze it. Why don't you turn to the black curtain? The standard for the curtain is whether it was an abuse of discretion, not whether this was the best possible way to protect the defendant's rights, and that's what the district court was trying to do. The district court was trying to balance the safety needs of the courtroom, which, by the way, shackles were not a remote possibility here. I believe Allen was serving a state sentence for manslaughter. This was a trial where they were facing extremely lengthy sentences, and the marshals had recommended shackles. The district court decided not to do that, but was trying to balance, this is going to be a long trial. There are a lot of witnesses. You know, if they react poorly and I need to put shackles on, how can I best protect their rights? And he determined that this curtain going down the middle would be the best way to do it. Now, was it an abuse of discretion? Absolutely not. As the Supreme Court held in Holbrook v. Flynn, jurors know that defendants are not there by accident. They didn't just drop there out of the sky, and not every practice that tends to single out the accused is worthy of reversing a conviction. And in Holbrook, they actually note that courtrooms are very dramatic places. In that case, it was additional security agents who were around the defendants, and the Supreme Court noted that. And that's exactly the case here, as Your Honor was getting at. Depending on the kind of courtroom you're in, there are flags, there's leather furniture, there are gates and different entrances for the judges and the jury and the public. And to them, there's no indication that any of these jurors thought twice about it. Would it have been advisable if a similar black curtain had simply been put around the government's table as well? I mean, wouldn't that have just made every — this entire argument go poof, right? If the argument was the jury came in, they see that the audience is separated by, you know, that low barrier, just like we've got back there, and that both sides are separated by this, you know, tastefully appointed curtain, and then it just looks like, well, no, this is just what each — you know, you each get a table, you each get chairs, and you each get a curtain. Yeah. Wouldn't that be advisable to make sure that in the future that happens, and then you don't have these arguments? My understanding is that Judge Arcaro now has the curtain go down the direct center instead of that L-shaped pattern. So, again, this is not a question of whether this was the best possible use here. It's whether it was an abuse of discretion, and it simply wasn't. And even if it was an abuse of discretion, any error would have been harmless because there's no indication the jurors thought twice about it. And the jurors certainly didn't feel uncomfortable asking questions because we know that at least one juror asked a question of the bailiff, and, of course, the juror — the district court conducted the voir dire to determine whether anyone on the panel had an issue. And there was — I'm just curious. Does Judge Arcaro have that black curtain down the middle all the time now? Unfortunately, Your Honor, I'm not a trial at USA, so I don't know. But I do know that from an informal poll in the office, I can represent that I believe that if he does put the curtain up, it does go down the middle of the courtroom. I also want to correct — it's my understanding that the defense counsel was able to direct where the photos were taken in the courtroom, so the fact that there's not a better or different photo, it's my understanding Judge Arcaro was pretty flexible with whatever record had to be made, and that that's how he chose to handle the situation. All right. I wanted to ask a question on the 924C counts. Yes. So you have one that relates to the narcotics conspiracy and another that relates to the Hobbs Act robbery of Johnson. And there was no instruction to the jury that they couldn't rest their findings on the same weapon, on the same possession for each of the counts, correct? I don't believe there was, no. But the jury verdict form did direct them to separate conduct, did reference the Woody Johnson counts 5 and 6, and then count 3 was the narcotics conspiracy. But the Woody Johnson kidnapping was arguably part of the narcotics conspiracy, wasn't it? That that was — the conspiracy was to possess with the intent to distribute or distribute narcotics, and the robbery of Johnson was to get narcotics, right? Yes. Yes. So isn't it possible that the jury concluded that the robbery and the possession of the both of the 924Cs? It's possible, but the standard isn't what's possible. Here, again, the standard is plain error because there was no objection to these instructions. And, you know, Eldridge and his counsel say that there's a substantial likelihood that the erroneous instructions affected the verdict, but the standard isn't substantial likelihood or may have. It's must have. Must have affected the outcome of the proceedings. And he can't show that — he hasn't shown that reversal is warranted because they must have affected the outcome. Here, given — even if we say that it's possible that the jury confused them, just looking at the quantum of evidence on each of the counts, there are multiple witnesses who testify to him carrying different types of guns for — not specifically saying he only did this — he only carried a certain type in trafficking and only a certain type of the Woody Johnson, but different types of guns at various points — that he had guns on him all day, every day when he was dealing drugs. And then Woody Johnson, of course, testified as to the use of the gun during his kidnapping and robbery. I would direct — there were over 52 witnesses in this case, but I would direct the Court to the testimony of Jay Renfro and Stephen Martin and Henry Lloyd as — and, of course, Woody Johnson. But the quantum of proof for both of these separately was such that there's — Eldridge hasn't shown that this must have, must have affected the outcome of the case. And I wanted to ask — since we still have time — I wanted to ask you about the sentencing. Yes. There's a suggestion that the 2009 conviction, which was for 2005 conduct, was relevant conduct for the conspiracy charged in the indictment, the narcotics conspiracy. And I guess that it's certainly the right time period and it's the same drugs that are in the conspiracy. So is it the government's contention that that 2009 conviction for 2005 conduct was not relevant conduct? It wasn't part of the narcotics conspiracy? At this point, yes, because — You mean at this point, yes. Well, I'm saying the — if you read the PSR, it's PSR paragraph 117. It is a very lengthy description of what exactly that prior conviction was. And it essentially, just to recap, was police were responding to a call about people possibly dealing drugs. They saw Eldridge with what appeared to be a plastic bag wrapped around a gun, and he took off running, jumping off of rooftops, you know, running through apartments, and was eventually caught with the gun and the drugs. But it was not part of the proof at trial. It was charged separately, and he was convicted before, I believe, this case was even indicted. There's no indication that it was relevant conduct. And simply because it took place within the same timeframe — Same timeframe, same drug, or at least one of the same drugs, and use of weapons. So I guess that's the question. I mean, it can't be both criminal history and relevant conduct. Correct. So your position is it wasn't relevant conduct, wasn't considered relevant conduct, and only was considered as criminal history. I see my time is expiring. Yes, you can. Go ahead. That's correct. This was raised by Eldridge Pro Se at the sentencing. There wasn't a lot of time to respond. But, yes, our position is that there's no evidence that this was anything other than a discreet criminal act. This was a person who, yes, operated as part of an enterprise and a legal conspiracy and a narcotics conspiracy, but that certainly doesn't preclude him from freelancing, as it were. And there's no evidence that it was anything other than that. And the standard, of course, for a factual finding like this is clear error, and it was not clearly erroneous to find that that 2009 conviction was not relevant conduct here. There's nothing to indicate that it was, and it certainly wasn't used in our proof of trial. Thank you. All right. Thank you. Thank you. We'll hear the rebuttal. Thank you, Your Honors. Lots of points to address, but I want to start with the speedy trial. So speedy trial, our math is different. We think that three out of the four categories and factors favor Mr. Eldridge. Let me get to the math, though. You're not asserting a speedy trial act violation? Correct. Only the constitutional violation. Okay. And so are there cases where a speedy trial act was scrupulously complied with, but nonetheless a Sixth Amendment violation has been found? Sure. I mean, sorry, I can't cite them to you, but they serve my recollection of the case law is that it's an independent constitutional right. So even if you checked all the boxes on the speedy trial act that does not answer whether there's been a constitutional violation, something can simply go on too long. And I think the law is pretty clear on that, but I'm sorry, I can't cite you to a case. And I know there are independent analyses. Usually, I mean, usually it's sort of at least I think the general perception that the speedy trial act is more onerous than the Sixth Amendment. The speedy trial act gives you 70 days with exceptions or exclusions that are very limited and have to be made on the record, the findings. Just one example. The speedy trial act will be told during motions, and if motions are engendered by, for instance here, destruction of evidence or loss of evidence by the government, then that's a speedy trial concern. We are having to deal with this for a long time because the government lost evidence. We've checked the speedy trial act box because it's a motion, but we still have the independent constitutional violations. So they do serve separate inquiries. And on the three out of four, obviously it's presumptively prejudicial in terms of length, six years, three months, six years, four months, however you want to do it. With regard to the prejudice that resulted, I want to point to the court, too, because I neglected to in my briefing. Under government appendix GA120, that's where Mr. Eldridge addresses the court in sentencing and talks about some of what he had to go through in terms of being in county jail, talks about losing weight, having to figure out law libraries. All those things that we know come with being in county jail. So in terms of it being particularly oppressive, we have Togano identifying that county jail is particularly oppressive. And I also need to remind the Court that what was weighing over his head were two murder charges and shooting our police off. I mean, serious stuff weighing over his head, which obviously resulted in incredibly long sentences. So in terms of the prejudice, we think that favors our client. And then finally, in terms of the reason for the delay, and I agree with the government on this, it's a difficult inquiry. I go and look through the 600 docket entries and I start trying to use three different coded colors to figure out who's responsible for what, and it's a not easy thing to do, but ---- Roberts. A lot of the delay can be attributed to the defendant, right? From our perspective ---- Were there, in fact, 122 defense motions? I haven't counted. The government did that. I know that we had two instances of destruction of evidence which required lengthy briefing and lengthy motion work and lengthy hearings. I don't know what to do with the fact that there was also concurrent issues that were being litigated and where that ends up falling. I haven't found that in the case law and how to deal with that. But thank you. Thank you. We'll hear from your colleague. Thank you. Just a couple of things. In terms of the photo that you asked about, Judge Chin, the defense had no input on it. We cite to the transcript in our brief at page 26 where the Court indicates that it will be a picture approved by the government, and the Court's going to decide one picture, one representation. That was it. In terms of whether the black curtain's up all the time, there's no other cases that I'm aware of from our district where judges use it. The only cases I've cited, like Judge Larimer had used it, but he had ---- excuse me, Judge Larimer had used bunting, not a curtain, and he had only used it in a rare circumstance where he had a very obstreperous defendant. I've tried cases for 20 years. This is the first time I've seen it. But Judge Arcaro continues to use the curtain, not ---- and it's not bunting around the tables. Do you think bunting is less prejudicial? Well, you know, there's the Davis case I cite to where you have some nice bunting around the defense table, some nice bunting around the prosecutor's table, some nice bunting along the back divider, and it looks almost decorative. And so it's different in terms of the effect. And you ought to do it for the government, though, if you're going to do it for the defense. That's all I'm asking for. That's all I'm asking for. Just make it fair so that not no undue focus is on the defense, because I think that's where you get into trouble. Thank you. Thank you. Well-reserved decision.